If I may, Your Honors, I'd like to reserve five minutes for rebuttal. I think I'll try to watch with you as well. I even promise to believe the yellow and red lights. All right. You might be the first. Good morning, Your Honors, and may it please the Court. My name is Randy Lusky, and I represent the petitioner and appellant, Mr. George Souliotes, an innocent man nearly 70 years old who spent the last decade of his life in state prison. This case, Your Honors, is fundamentally about interpreting and applying the justice to breathe. To dismiss Mr. Souliotes' petition because of a five-day filing delay will result in a tragic miscarriage of justice that this Court should seek to prevent. As you well know, we fully breathe deep to the three certified issues on appeal, and I'm more than happy to answer any questions that you have about those three issues today. But if you don't mind, I'd like to focus today's oral argument first on our actual innocence gateway claim and second on statutory tolling. Turning first to our actual innocence gateway claim, Your Honors, this Court reviews Judge Wanger's decision de novo. One — two threshold issues that I'd like to comment on before we jump into the facts. And the first is, I think it should be clear to this Court that there's no basis upon which Judge Wanger's decision should be affirmed for the same reasoning that he — that he provided. Senior Judge Wanger held, as his only grounds for his refusal to dismiss — his refusal to consider our actual innocence claim, that we had not stated a precise legal argument. He essentially held that we never articulated the claim that Schlupp's gateway applies to AEDPA's one-year limitations period. That was incorrect. In our opposition papers, and at Excerpts of Record, page 979, we specifically argued that, quote, AEDPA's statute of limitations must be told when an evidentiary showing demonstrates that its application would work a miscarriage of justice. Not only do we make the legal argument, but we cited the Lisker v. Knowles case and attached that case. In my opinion, the most comprehensive and well-reasoned legal opinion on this — on this issue. Notably, the State never took issue with our legal claim. So there was only one legal contention in front of Judge Wanger, yet he held that the Petitioner does not address this issue and the Court is unwilling to make the party's arguments for them. Is there a split in circuits as to whether or not the actual innocence claim applies in the AEDPA one-year statute? It — it depends how you define the word split, Your Honor. All right. What does the Sixth Circuit say, and what does the Seventh Circuit say? Absolutely. They seem to be the most important circuits. They do. And Judge Karen Moore's opinion in the Sixth Circuit is really an extremely well-reasoned opinion that holds affirmatively that AEDPA — excuse me — that Schlupf's actual innocence gateway can and does excuse noncompliance with AEDPA's one-year limitations. It walks — one-year limitations, period. She walks explicitly through the congressional intent and legislative history, the well-defined case law pre-AEDPA that held that claims otherwise time-barred could be considered if the Petitioner presented a colorable claim of innocence. The Seventh Circuit, in one opinion — I believe it's Escondida, I may be mispronouncing that — there's essentially one line not fundamental to the holding where Judge Easterbrook comments that there is at least district court case law that he supports in that opinion that it should not apply. However, the Ninth Circuit, Judge McKeown, as you very well know from your opinion in Johnson v. Knowles, has at least assumed without deciding that the exception … We basically, as far as I can see, have sidestepped it. That's correct. I wasn't going to put it that way. Well, we — you know, it's like many things where we can assume a result without making a decision and we can decide on alternate grounds. Absolutely. Can we do that here? No, Your Honor. Here — here are the facts. Time has come one way or the other. Time has come. And the reason why this is the appropriate test case is because Mr. Soliotas has indeed demonstrated a colorable claim of actual innocence. And there's an important — there's some confusion in the briefs I'd like to clear up before we jump into the facts. The AG criticizes us for raising a freestanding Herrera claim, which it claims is — has a very extraordinarily high standard. In those claims, there are substantive claims of innocence where the Petitioner asks to be let out of jail, essentially, because of his innocence. Today, the issue before this Court is not a substantive claim of innocence. It is a procedural claim of innocence where we ask — where we demonstrate that Mr. Soliotas' innocence should excuse his otherwise late-filed petition. And that's an important distinction. The Herrera standard is obviously extremely high, but the Schlupf standard does not require affirmative evidence that conclusively demonstrates innocence. Rather than — But in order to get through that gateway, don't you have to show that it's more likely than not no reasonable juror would have found Petitioner guilty beyond a reasonable doubt? We do, Your Honor, but — And don't we have to have an — doesn't someone have to have an evidentiary hearing to decide that? That would be nice, Your Honor. We requested an evidentiary hearing at the district court level, and we were denied that request. Well, aren't you — That's the question, is even if we were to determine that there is a legal permissibility, that's not something we could decide on this record. Your Honor, I agree — I agree that the record below — this Court is handicapped in its de novo review because of Judge Wanger's refusal to hold an evidentiary hearing. The facts that this Court has before it have been constrained somewhat by page limitations and word counts that we are limited to in our Ninth Circuit briefing. However, I will submit that I believe that the evidence we have presented is enough to meet the more likely than not standard that Judge Zilli articulated. The way I like to think of that standard, Judge Zilli, is more likely than not is a key part of it that we often gloss over. The question is, if you have a jury of 12 reasonable jurors, properly instructed, impartial, objective jurors, will they return unanimously an acquittal? And if — what are the chances of that? If we can prove that there's a 51 percent chance that they will, then it's more likely than not that Mr. Soliotis will be — would be found innocent or not guilty beyond a reasonable doubt. I'm still not clear. Are you saying that because the record hasn't been fully developed, if we were to conclude that he has gotten through the gateway, we would necessarily need to remand for an evidentiary hearing to determine whether that test has been met? No, Your Honor. I think as — Are you thinking the record is sufficient? I think in the first instance, this Court could determine that the record is sufficient before it. This Court has Mr. Lantini's declaration, which demonstrates that the most conclusive evidence that was relied on during Mr. Soliotis's trial has now been absolutely dismantled. You have the testimony from the first and second trial that both the State and Mr. Soliotis have tried to put before this Court, although it is understandably an incomplete record because there hasn't been an evidentiary hearing. And so certainly, Your Honor, reversing and remanding is an option. Turning to Mr. Soliotis's actual innocence claim and the facts, if you — the first main point, and I think this is fleshed out in the briefs, the central forensic evidence that the prosecution relied on to prove that Mr. Soliotis was connected to the crime has now been conclusively discredited. I understand Federal courts are flooded with claims of newly discovered evidence that calls into question a peripheral fact from a trial. This is not one of those cases, Your Honors. This is a case where the only scientific connection that proved Mr. Soliotis was at this crime scene has not been called into question, but has been completely and irrefutably discredited. So you liken this to a DNA discovery down the road? I am — I can't go that far, Your Honor, because in a DNA case, obviously, it provides affirmative evidence of sometimes an alternative perpetrator. And we can't do that. But what we can say is that — But if you have DNA evidence that excludes the incarcerated defendant — Correct. — would that be a close analog to yours? It would, Your Honor. It absolutely would. And it's a good way of thinking of it. The State now, in reaction to our MPD evidence, seeks to downplay that evidence and instead claim that this dubious eyewitness identification from trial and the State's convoluted financial motive theory were the key parts of the trial. But the record proves otherwise. When you look, really, at the opening and closing statements and the parade of fire experts that the State put on, it becomes clear that the key fact that the jury hung its hat on was MPDs. The State said, quote, in its closing, And who else has the same accelerant on his shoes as was found at the scene of the crime? We scored a touchdown when those two cans came back out of that floor as medium petroleum distillates. That is the evidence. It's not speculation. It's not hypothetical. It's not academia. It's the cold, hard facts. Just like the genie in the bottle, the demons are in those two cans. It went on to say, The DOJ says the shoe has a medium petroleum distillate on it. The same thing that was used to start that fire. Your Honors, if I may, I'd like to turn briefly to our statutory tolling argument before I yield for rebuttal. One last thing I should say on actual innocence. The State will come up here and present a multitude of countervailing facts that potentially bear on Mr. Soliotis' guilt. One thing to keep in mind when the State does that is that they present a one-sided view of the record that only lays out those – that evidence that came in during the second trial. When Mr. Soliotis' lawyers called no witnesses in his defense, every single piece of incriminating testimony the State will refer to – this incident with Hope Warner, the knowledge that Mr. Soliotis could have got insurance proceeds – was fundamentally and flatly contradicted during the first trial. And on rebuttal, I can be prepared to demonstrate those facts. On statutory tolling, Your Honors, if you don't mind, I'd like to turn there briefly. Mr. Soliotis did not know, nor could he have had any reason to know, about the breakthroughs in MPD science until September 2005. This Court should review this issue de novo, because Senior Judge Wanger made a purely legal determination when he held that we had not asserted sufficient facts to prove that Mr. Soliotis could not have known. The facts in the record are clear. We've – we've stated a good-faith assertion that he could not have known. Nowhere in the scientific literature was the MPD breakthroughs published. Nowhere does the State point to anywhere that Mr. Soliotis – that should have put Mr. Soliotis on notice that these advances had been made. And the district court refused to allow us an evidentiary hearing on the precise issue that Mr. Soliotis could not have known that these advances existed. We believe that we've met the standard under 2244d1d, and the triggering date of ADPA's 1-year limitation should not be until Mr. Soliotis could have known about these, which was in September 2005. Under that statutory framework, you would only be able to argue actual innocence and no other constitutional claim? That's not correct, Your Honor. Mr. Soliotis – excuse me, I think I interrupted. No, I was finished. Go ahead. I believe Mr. Soliotis, in his brief, we laid out the circuit split on that issue. And we believe that the Walker court's holding in the Third Circuit – excuse me, in the Eleventh Circuit got it right on that question. Congress used the word application for a reason. And it did not envision a scenario where each claim in a habeas petition would have different start dates. Rather, Congress said that the 1-year limitation period, singular, will apply to an application. I would – I'm sorry. Thank you. I told you that I would pay attention to the clock. I want to hear from the inequitable tolling when you come back as well. I think you make a lot of argument in your briefs about that. I haven't heard a word about it. I will be prepared to provide some words for you, Judge Daley. Thank you, Your Honors. Ms. McKenna. May it please the Court, Kathleen McKenna, on behalf of the Warden. I think it's important for this Court to recognize before we even reach the issue of the actual innocence gateway that this is not the case that this Court should consider for reaching whether or not there even is. And we state that there is not an actual innocence gateway to proceed through a statute of limitations violation. But if there were, this case does not present a good opportunity for this Court to consider that, because Petitioner cannot show the miscarriage of justice standard that is required even under the procedural default case of Schlupp v. Dillow, because he doesn't The evidence that this, that the appellant relies upon to hang his actual innocence claim was discredited during cross-examination at trial. When the criminalist was examined on the issue of the MPD, defense counsel questioned her as to whether or not this MPD can be found in construction of shoes or whether it's commonly found in other household products. And she agreed, yes, that it is used sometimes in manufacturing of shoes and that it occurs in many household products and it's by no means, this evidence was by no means the conclusive evidence showing Mr. Suillioz's guilt. Well, but in the closing arguments, didn't the State rely heavily on the shoes? The shoes tell the tale. Well, that's correct, Your Honor. Hasn't that evidence now been refuted by the new evidence that we can now exclude? It has been, yes. It has been more conclusively refuted. So the State relied heavily, would you agree, on that testimony and the shoe evidence in the trial? Yes, it did in the closing argument discuss that. All right. And that evidence now has been proven to be not supported as a result of new tests that are available, is that right? That's correct. However As I state, the material found in these shoes is different from the material found at the fire scene on items three and five. That's correct, Your Honor. However, there is considerable, substantial, strong evidence, and this evidence alone does not satisfy the miscarriage of justice. If the Court considers the entirety of the evidence that was presented at trial, the appellant's very, very distinctive and unusual recreational vehicle that was seen by the eyewitness, it was not purely her identification of Mr. Suleotis, but her identification of his very unusual recreational vehicle, which she saw stop in front of the home, which his neighbors saw, which they testified was normally kept within his fenced yard. However, hours before the fire, his vehicle was parked out on the street, which they noted as being highly unusual. He was seen he was actively trying to evict these tenants because of his desire to rid himself of the home. He went to the bank, tried to throw his keys to the bank and say, I don't want this house anymore. Can I, will you please take my home back? He was in his monthly expenses far exceeded his income, and he was trying to rid himself of this home. The jury heard considerable, very strong evidence that Mr. Suleotis was trying to get rid of this house one way or another and trying to get his tenants out of the house. And this evidence would not be overcome. The evidence of this one declaration by Mr. Lentini is not sufficient to overcome the innocence gateway, the miscarriage of justice standard where no reasonable juror would have convicted him had this evidence been presented. But I'm a little confused. Maybe you can help me out, too. Certainly. In the district court, when Judge Wanger talked about the actual innocence claim, he basically says the petitioner doesn't address this issue of whether Schlupp is applicable to the federal habeas petition. And so it's almost, as I was reading it, I'm wondering, is he saying it's waived, or what's the procedural posture that you might be able to help us out with? Certainly. And I'd be happy to address the court why the procedure, why the actual innocence gateway should not even apply to a statute of limitations. There's a difference, a fundamental difference between a statute of limitations violation and the case presented in Schlupp. Schlupp applies to procedural default, in which case the appellant has never had the opportunity to present his claims before the State court. And without that gateway, he would never be able to present any of his constitutional claims, let alone his the innocence claim as a gateway to allow him to present In this case, he had the opportunity to present these claims to the State court. However, he did not present it to the new evidence newly discovered since the trial. Actually, that claim was presented to the State, to the California Supreme Court in his State habeas petition. That court did consider that claim and denied his petition. That was in the amended, petitioner amended his State habeas petition in the California Supreme Court and did present that claim. And it was denied by the State Supreme Court. So he's had the opportunity to present all of these claims in the State court. Precisely in the State Supreme Court, he presented the claim that there's now a new method for doing the testing. Yes, he presented Lentini's declared affidavit. Yes. Okay. And so once he presented that, you're saying that he now, he can't come up on habeas or is it simply a matter of timing? It is, it is. May I just maybe rephrase it? The timing is not related to the discovery of the Lentini evidence? Is that what you're saying? Well, I'm saying simply that he did present this claim. However, that does not excuse the lateness of his Federal habeas petition. And as I said, there's a difference between a procedural default and a statute of limitations violation. And the purpose behind the statute of limitations is to require the appellant to present his claims in a timely fashion. That is one of the strong reasons behind AEDPA, is to require that these claims be timely presented. And just on that note, I would like to say that the Fielder v. Varner case lays out a very well-reasoned decision in terms of why these claims should be considered on a claim-by-claim basis, because otherwise, if we permit appellants to wait for an actual innocence claim to develop, then they have no reason to timely present claims that they're aware of. So if we adopt the Fielder approach, which is the claim-by-claim approach, and we were to limit our consideration here just to the actual innocence claim, and you're saying that that, in fact, was presented to the California Supreme Court, and the reason it didn't get to Federal court on time is because they claim there was this ambiguity in the court's record, is that the supposed cause of the delay? I believe that is their equitable tolling argument in terms of their delay. And, of course, that was we disagree that it was ambiguous. And, in fact, they had the court's record with the order from the Supreme Court denying the petition for review itself, which is stamp-dated. Ginsburg. Well, let's say if we disagreed with them on that, so that they couldn't get equitable tolling based on the way that the, you know, that the court docket read, what would be their other alternative to be able to come to Federal court late? Well, there is, under the statute of limitations, if they had a constitutional claim, not an actual innocence claim, a constitutional claim under D1D for which they could not discover the factual predicate, there is an allowance for that in the statute of limitations. If a newly discovered claim, they could not discover the factual predicate, but that applies to a constitutional claim, such as, for example, if there were a Brady claim where they were denied evidence and they were not able to discover that, that would be a valid factual predicate for presenting, for tolling the statute of limitations. You're taking the position that if somebody was actually innocent, but they didn't present it in the character of a constitutional claim, they would never be able to come to court once they had newly discovered evidence that occurred after the deadline? Well, if it were characterized, if it were a constitutional claim, but a freestanding actual innocence claim, no. This, the United States Supreme Court does not, has not allowed, it is an open question under House v. Bell, but it is not a permissible grounds because under the statute of limitations is there to require a defendant to present claims in a timely fashion. If it is a constitutional claim which would allow him to present a late-discovered claim, he could do so. Are you combining, I mean, as I understand it, under the statute D-1-D, an actual innocence claim can trigger proceeding on the actual innocence issue only. Well, there's a split in the circuits there, but Schlepp would open the door, the it not, if it applied. Are you saying that there is no way under Schlepp to have an actual innocence claim that would give you a gateway to present all your constitutional claims? If it were a constitutional claim under D-1-D, yes. If it were a edge that only allows Let's just hypothetically say there's a constitutional claim here. The lawyer in the second trial presented no evidence in the first trial. There were ten witnesses that testified for the defendant, and he got a hung jury. Second trial, no witnesses. Now, at least there's a suggestion there that something happened in the second trial. But in any event, let me ask you this. If this Court were to adopt the reasoning of the Souter v. Jones Sixth Circuit case, what would be the result in this case? Well, I think Souter v. Jones presents an exceptional circumstance. That case is not simply Well, we simply disagree. We don't I want the facts there. There was evidence from three pathologists linking this bottle to the wounds of the victim. And then after the trial, each of these witnesses kind of backed off. One recanted. One said he'd been forced to testify. I mean, isn't it very similar factually to the kind of evidence here? It's the shoes. Now we know it's not the shoes. Well, I would disagree with that characterization of the evidence, Your Honor, simply because in Souter, first of all, it was something like 12 years, I believe, before he was ever charged with that case. And there was vacillating back and forth along that way between among the doctors determining, yes, no, the evidence did not support his guilt, yes, it did. And it went back and forth. In this case, this evidence is nowhere comparable in terms of its importance overall. And I think I cannot emphasize enough that it's important for the Court to view the one single bit of evidence, because there was compelling evidence pointing to Mr. Siliotis' guilt. And the simple – this evidence was only one small part of the trial. And in fact, there was one – excuse me, go ahead. Kennedy, if you say there was more evidence, but if you get through Schlepp and the gateway, would the appellant be entitled to some sort of an evidentiary hearing where he could call witnesses to testify and confront the testimony? Or are we limited to the record, either here or down, if it's remanded? Well, in this particular case, I – the evidence that the Petitioner relies upon probably does not satisfy the requirement to have an evidentiary hearing, because it is not clear and convincing that evidence that would entitle him under 2254e. And the test is more likely than not no reasonable juror would have found Petitioner guilty beyond a reasonable doubt. Can we do that one way or another? Are you suggesting we can, based on this record, make that determination? Absolutely, Your Honor. If you – if the record is reviewed in its entirety, and there was one – there was one witness presented by the defense in this trial, one defense witness. However, in the first trial, the jury hung 11 to 1, and it's quite clear in favor of conviction based upon how rapidly – and in the habeas proceedings, the defense attorney from trial said he found certain of the defense witnesses he had presented previously not at all helpful. You're saying that they – that we know that they hung 11 for guilt? It appears based upon the – You're basing that on the timing of the vote. On the rapid – yes. I mean, I think that's a reasonable assumption based upon how rapidly – I think we have to say, because we've seen it go both ways, that when, you know, people are out and they're waiting for the jury to come back, they always speculate on the timing issues. But it's come back both ways. So I don't – I think we have to say we just don't know. Well, and isn't there evidence here that the jury in the second trial was shocked that the defendant didn't call any evidence and really were kind of angry at the presentation? I mean – I think my time is up. I can answer that, Court. Please go ahead. Well, the evidence that is presented is not – it's not sworn affidavit. It's simply a report made by a defense investigator, his own representation. But there are no affidavits to that effect, no sworn statements to that effect. So it's not very compelling evidence. I have another question just to – this EDPA, as you know, since you deal with it all the time, it's not an uncomplicated statute. But if we were to adopt your formulation of Fielder and say, okay, well, whatever it is, it's only the claim of actual innocence based on this new evidence, and so under 2241D1, the question is when did they discover the new evidence? Is there a dispute about that? Because I think counsel said first knowledge is September of 2005, and that triggers the one-year triggering date. What is your position on that? Well, simply, that – because that is when they discovered it does not mean that's when they could have discovered it. They didn't ask or – they made no effort to challenge the evidence until shortly before they discovered this evidence. So during this time, time had passed, and that's what the district court mentioned also in its findings, in its order, that, you know, why did they wait so long to challenge this evidence? I mean, we don't know. There's nothing in the record that says for certain that it could not have been discovered. This is simply when they did. I feel like I'm in one of those Twilight Zone movies because they say, well, we couldn't – as soon as we were able to discover this evidence, we presented it to the court, and then the district court, and you were saying, well, maybe you could have discovered it earlier. So whose burden is that once they put it forward initially? To determine when they could have discovered it? Because this new or could have known, to me, kind of always smacks of a factual issue. And in that case, the district court's finding that they should have sought it sooner seems to be deserving of clear – What's that basis for? Well, that there was no evidence to show that there had been any effort to seek evidence prior to this time. I know, but that's like we're back into this, you know, this vacuum tube where it says, well, you didn't seek it before, therefore, you know, what if it wasn't available? I mean, I guess we don't – do we know when this kind of procedure became more widely accepted scientifically? Do we have evidence of that? There is no evidence one way or the other. However, they did discover – they still discovered it in time that they could have filed this petition in a timely manner because they discovered before all of their tolling time had passed as they presented the claim to the state court. Within the time to file the California petitions? Yes. And in time to present the Federal petition. Thank you. Thank you. Let me start where Ms. McKenna left off, and that is that you had – you actually were able to file your state petitions, and therefore, you don't really need to so-called bust the Federal statute of limitations because of new evidence. Absolutely, Your Honor. So the – Ms. McKenna is absolutely right that we filed our Supreme Court brief and included Lentini's declaration there, and that was in late 06. The time under 2244D1, the one-year limitations period, begins running when we could have discovered through the exercise of due diligence that evidence. We've put in evidence to the record that suggests that September 2005 was that date. We then had one year from September 2005 to file our Federal habeas petition, and we met that deadline. What was the date – what is the triggering date from the state court decision? So the state court decision is a separate inquiry. There's a separate subsection under 2244, as you well know, that says – The dates and the timing on that. So the state court's decision was final on October 22nd – excuse me, October 16th, 2002. Okay. And so that is the separate analysis that sort of kicked off the triggering of the ADPA limitations period. But we argue that our new limitations period should start under 2244D1D on September 2005. And to answer Judge McKeown, you also raised a question about whose burden is it to present that evidence that we could not have known earlier. The Ninth Circuit in Whalum Hunt conclusively answered that question. They held, quote, where the Petitioner alleges circumstances consistent with the petition that would entitle him to a finding of tolling, the district court should give Petitioner the opportunity to amend his petition or expand his declaration for further developing. The laws court in the Ninth Circuit also held, we do not require Petitioner to carry a burden of persuasion at this stage in order  Well, what case are you reading from, counsel? Excuse me, the second one was the laws case. They were both Ninth Circuit opinions. Your Honors, with all due respect, the legal discussion that just ensued confused the legal issue at hand. And even if this Court finds that we don't meet equitable tolling and that the confusing docket entry is in the grounds or extraordinary circumstances, even if this Court somehow finds that we don't meet statutory tolling, the Schlupf Actual Innocence Gateway is a separate legal analysis that would entitle a Petitioner to have his otherwise time-barred constitutional claims, that includes our claims for juror misconduct, ineffective assistance of counsel, Vienna Convention violations, among others, to be heard on the merits. Your Honors, I'd like to also turn to the factual recitation that Ms. McKenna provided. As predicted, I said that there would be a few – there would be facts that were alleged that suggest, you know, that suggest guilt. Ms. McKenna said – mentioned a few of these. First, she said that Mr. Soliotis was trying to evict these tenants and he wanted them out of the house. What she doesn't tell you is that the tenants had already been evicted. He had already successfully secured an eviction and the sheriff was on their way – on his way in five days. So the State's theory, if you step back and think about it, is that Mr. Soliotis, a man with no priors, a man who knew that the tenants were going to be kicked out of his house in five days, committed this fire – committed this arson for insurance proceeds, for $90,000 in insurance proceeds, even though he had an outstanding offer to buy the house for $78,000. He decided to commit this arson while the Joneses were still in the house, rather than waiting five days for them to leave. He then hopped in his Winnebago, the largest of his three vehicles, with a huge sleeper on top and large running lights that circled it, and circled the house 15 times. The only evidence – the only thing in the record that confirms that this is what happened is the testimony of 19-year-old Ms. Monica Sandoval. Ms. Sandoval was unable to identify Mr. Soliotis the day after the fire. She was 100 yards away. So I sometimes gloss over that. That's like an NFL football field away, in the middle of the night, on a misty night. And she, the next morning, said, I quote, did not get a good enough look at Mr. Soliotis. Six months later, at the preliminary hearing, Ms. Sandoval is now able to say that she can identify Mr. Soliotis after she's had unrelated criminal charges against her dropped and after she's seen Mr. Soliotis's picture in the Modesto B over and over again. The State refers to a distinctive vehicle that Mr. Soliotis was driving. What they don't tell you is that the notes that the investigator took down when they interviewed Ms. Sandoval described that vehicle as a Dodge Caravan. Mr. Soliotis doesn't have a Dodge Caravan. They also described the most distinctive feature of that vehicle is that it had a ladder on its back. Mr. Soliotis's vehicle does not have a ladder. Ms. Sandoval also claimed that there were no lights on top or nothing on top of this Dodge Caravan that she saw driving around 15 times. Mr. Sandoval's vehicle has a large sleeper on top. And so Ms. Sandoval's testimony on its own, once divorced from this scientifically unrefuted evidence that seemingly bolstered her identification, on its own is insufficient to connect Mr. Soliotis to this scene beyond a reasonable doubt. And I submit to you that we have met the Schlupf standard and that this Court should hold accordingly. Unless there are any further questions, I will deem the matter submitted. Thank you. Thank you, Your Honors. I thank both counsel for your arguments this morning and for the briefing and the unresolved issues. The case just argued, Soliotis v. Evans, is submitted.
judges: Zilly, Hall, McKeown